**Nathaniel GRIMES, Petitioner,**

v.

**L. L. WAINWRIGHT, Director of Florida Division of Corrections, Respondent.**

**Civ. A. No. 1793.**

United States District Court,
N. D. Florida,
Tallahassee Division.

Aug. 18, 1972.

Nathaniel Grimes, pro se.

A. S. Johnson, Asst. Atty. Gen., Tallahassee, Fla., for respondent.

## ORDER

MIDDLEBROOKS, District Judge.

This cause is before this Court upon petitioner's application for writ of habeas corpus and for leave to proceed in forma pauperis; response thereto having been made to this Court's order to show cause and reply to response to order to show cause thereafter having been filed by petitioner.

On October 3, 1969, the petitioner was adjudged guilty of the crime of murder in the first degree and sentenced to death by the Circuit Court in and for Leon County, Florida. The Florida Supreme Court affirmed this conviction on January 28, 1971, sub nom., Grimes v. State of Florida, 244 So.2d 130 (Fla. 1971).

Petitioner alleges three grounds in support of his application for writ of

habeas corpus. They are: (1) that the fruits of a warrantless search of petitioner's home were erroneously admitted into evidence at trial; (2) that petitioner was denied due process of law when the trial court refused to suppress the alleged confession which was obtained from him after he had been transferred from another state without formal extradition; and (3) that the trial court erred in allowing a transcription of petitioner's tape recorded statements to be published to the jury.

These same allegations appear to have been raised in the Florida Supreme Court on direct appeal; hence, exhaustion of state remedies has occurred. See Fitzgerald v. Wainwright, 440 F.2d 1049 (5th Cir. 1971); Bartz v. Wainwright, 451 F.2d 663 (5th Cir. 1971).

## I

■ The Court is of the opinion that the second and third grounds alleged by petitioner do not raise substantial federal constitutional questions which would be supportive of habeas corpus relief. Petitioner does not deny the statements attributed to him but alleges that they should be inadmissible because petitioner was not formally extradited to the State of Florida. It is interesting to note that petitioner made the statements after returning to Florida and after he was given his "Miranda" warnings. In this posture this Court is of the opinion that there is no federal constitutional infirmity in the trial court's refusal to suppress the confession.

■■ Relative to petitioner's allegation that the trial court erred in allowing a transcription of his tape recorded statements to be published to the jury on the ground that the transcription was not the best evidence, this Court being of the view that this question is one of the evidentiary nature, concludes that it does not rise to that constitutional level necessary for federal habeas corpus re-

lief. Petitioner does not allege that there was any error, omission, or deletion from the taped statements nor does he contend that the evidence presented to the jury by the reading of the transcript made from the tapes was different from the recorded taped statements. Furthermore, petitioner does not allege that the jury was misled or influenced by this procedure in any way. It appears then that there has been no deprivation of any federal constitutional right. See e. g. Pleas v. Wainwright, 441 F.2d 56 (5th Cir. 1971); Flanagan v. Beto, 437 F.2d 895 (5th Cir. 1971).

## II

■ The remaining point to be considered is petitioner's contention that evidence admitted at trial included the fruits of an illegal warrantless search. He argues that Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) should be applied retroactively to the search in question to render it void and the fruits of that search subject to suppression. This argument falters when considered in light of Williams v. United States, 401 U.S. 646, 91 S.Ct. 1148, 28 L.Ed.2d 388 (1971) wherein the Supreme Court decided that *Chimel* is not to be applied retroactively and should not be applied to searches conducted prior to June 23, 1969. The search in question occurred in January, 1969. Following *Williams*, supra, this Court must therefore look to the standard of law which prevailed prior to the *Chimel* decision to determine whether the search was valid.[1] See United States v. Avila et al., 443 F.2d 792 (5th Cir. 1971).

The pre-*Chimel* standard was that formulated in the case of Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947) and United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950). Under these cases a warrantless search made incident to a

---

1. For examples of the post-*Chimel* standard, see United States v. Harrison, 461 F.2d 1127, 5th Cir. 1972; United States v. Colbert and Reese, 454 F.2d 801, 5th Cir. 1972.

valid arrest was constitutionally permissible where the totality of the circumstances revealed the search to have been reasonably made. The single great difference between that standard and the one enunciated in *Chimel* is that *Chimel* considerably narrowed the permissible scope of searches incident to arrest. An example [2] is the *Harris* case itself later disapproved by *Chimel* in which the court found that a search of a four room apartment did not go "beyond that which the situation reasonably demanded". *Harris,* supra, 331 U.S. at 153, 67 S.Ct. at 1102. The cases which followed these decisions show that the "totality of circumstances" standard was implemented in such a way as to provide a degree of latitude and flexibility to officers making searches. See e. g. Abel v. United States, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1959); *Avila,* supra; Rhodes v. United States, 224 F.2d 348 (5th Cir. 1955); Lyon v. United States, 416 F.2d 91 (5th Cir. 1969).

▮ The facts pertinent to resolution of this issue reveal that on January 14, 1969, Captain Lane of the Thomasville, Georgia Police Department received a police bulletin advising his office to be on the alert for a green two-door hardtop 1967 or 1968 Dodge Dart, very dirty, with a red-striped sidewall tire and missing hub cap. The bulletin stated that the automobile was believed occupied by two colored males armed with one or more pistols. The bulletin further stated that it was believed that this vehicle had been involved in an armed robbery in Tallahassee, Florida, the night before.

Having been given this forewarning, Captain Lane observed an automobile which fitted this description parked in front of the residence of the petitioner in Thomasville, Georgia. He radioed the tag number to the dispatcher and requested a check to ascertain if the automobile was stolen. He was advised that the vehicle had been reported stolen in Titusville, Florida. Captain Lane and a companion, Sergeant Barkley, then placed the automobile under surveillance.

During the course of the surveillance, they observed the petitioner wearing a blue bathrobe as he came out of his house. Petitioner went back into the house for a few minutes, reappeared without the bathrobe, approached the automobile, opened the door and removed a green jacket. At that time the officers approached the petitioner in his front yard and identified themselves to petitioner as police officers. Captain Lane asked the petitioner who was occupying the house and upon being informed that petitioner's wife and baby were inside, the officers requested and received permission to check the petitioner's residence.

Captain Lane left petitioner in the front yard in the presence of the accompanying officer and went into the house to inspect the premises. The front door was locked. Upon request Mrs. Grimes admitted the officer after being informed that petitioner had given permission to check the house for other persons. Examination of the premises disclosed that no other persons were occupying the house. Captain Lane then asked his companion officer to bring petitioner into the house.

After petitioner and the officers entered the house, Captain Lane asked petitioner who owned the automobile. Petitioner replied that he did. Petitioner was then placed under arrest and was advised of his constitutional rights as contemplated by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Following the formal arrest of petitioner, the officers testified that they requested permission to look around the house. Permission to search was alleg-

2. Another example is Elkanich v. United States, 327 F.2d 417 (9th Cir. 1964), the companion case to *Williams,* supra, wherein the Supreme Court upheld the validity of a warrantless search of petitioner's four room apartment, which search was made incident to a lawful arrest.

edly given by Grimes.[3] The room where the alleged tainted evidence was found was approximately six to eight feet from the point in the house where petitioner was placed under arrest. The blue bathrobe which petitioner wore earlier that morning was the first item Captain Lane noticed. As he picked it up one of the pockets bulged out and he could see a pistol inside the pocket. Captain Lane then inquired of the petitioner if the petitioner wished to carry some clothes to the police station with him. The petitioner replied affirmatively. As Captain Lane picked up petitioner's jacket he observed two women's stockings, one of which was torn. Captain Lane removed the man's green wind-breaker jacket, a green turtle neck sweater, two stockings, a blue bathrobe and a .22 revolver.

In examining the totality of the circumstances surrounding the arrest and subsequent search the fact that the police bulletin stated that two armed colored males were wanted in connection with an armed robbery would have caused a cautious and prudent police officer to check for or search the immediate area in which petitioner was arrested for weapons and contraband.

■ It is not unreasonable to assume, too, that if a second armed man was hiding in the house or if a weapon was available or within the reach of the petitioner or his wife, the danger to the officers was imminently apparent at the moment they placed the petitioner under arrest. Thus, a search incident to a lawful arrest was instituted; and in a room across the hall from where petitioner was arrested, a mere six to eight feet from the petitioner, the officer spotted a robe which the petitioner had been wearing a short time earlier and found the weapon admitted into evidence which petitioner sought to suppress as the product of an unlawful search. Thus, the totality of the circumstances considered, this Court cannot find that the search in question was unreasonable. Under the law existing contemporaneous to the search the seizure of the various items would have been justified as occurring in the course of a valid arrest.[4]

Accordingly, it is

Ordered:

■ Leave to proceed in forma pauperis be and the same is hereby granted.

■ Petitioner's writ of habeas corpus be and the same is hereby denied.

---

3. Because this Court's decision rests on grounds that the search was lawful as incident to a valid arrest, the Court does not reach respondent's alternative argument that a valid consensual search was made. Without intimating any view as to the persuasiveness and correctness of this argument, the Court has nonetheless considered several recent Fifth Circuit opinions as to this issue. Hoover v. Beto, 467 F.2d 516, 5th Cir. 1972; Bretti v. Wainwright, 439 F.2d 1042 (5th Cir. 1971) ; Perkins v. Henderson, 418 F.2d 441 (5th Cir. 1969) ; Phelper v. Decker, 401 F.2d 232 (5th Cir. 1968).

4. The Court has no difficulty in finding that there was sufficient probable cause existing for an arrest without a warrant, see e. g. Dodd v. Beto, 435 F.2d 868 (5th Cir. 1970), and that petitioner's arrest by state officers was lawful. Thus, under *Harris*, supra, and *Rabinowitz*, supra, the necessary condition precedent for a warrantless search has been met.