**UNITED STATES of America**

v.

**Steven B. AISENBERG Marlene J. Aisenberg**

**No. 8:99–CR–324–T–23A.**

United States District Court,
M.D. Florida,
Tampa Division.

Nov. 9, 2000.

Rachelle DesVaux Bedke, Stephen Kunz, United States Attorney's Office, Tampa, FL, for United States of America, Plaintiffs.

Todd A. Foster, Barry A. Cohen, Cohen, Jayson & Foster, P.A., Tampa, FL, for Steven and Marlene Aisenberg, Defendants.

## ORDER RESPECTING AUDIBILITY

MERRYDAY, District Judge.

Marlene and Steven Aisenberg seek a determination respecting the "audibility" of certain recordings. These recordings result from law enforcement's electronic surveillance and interception, pursuant to warrants issued in state court, of conversations occurring in the Aisenbergs' home, including telephone conversations with persons outside the home. The Aisenbergs assert in general that:

> The tapes of the conversations alleged in the indictment are so inaudible that the recordings are untrustworthy and unreliable and should not be presented to the jury.

The Aisenbergs request that a hearing on audibility occur "well in advance of trial."

The memorandum included in the Aisenbergs' motion for an audibility hearing advances the view that, "if the unintelligible portions of the tapes are so substantial as to render the whole recording untrustworthy" or if the recordings are not "sufficiently complete to be reliable," the Court should declare the recordings legally inaudible (and, presumably, inadmissible as a consequence). The Aisenbergs argue that the Court should determine audibility in view of both the "probative nature of the tapes," as well as whether the "flow of the conversation" is "qualified by anything said in the omitted or inaudible portions," whether the tapes "recount the entire event," and "whether the tapes are confusing and of no probative value." The Aisenbergs suggest that, measured by these standards, the recordings of their conversations are legally inaudible.

The United States responds to the Aisenberg's motion by outlining the foundational elements necessary to present a recording as evidence, including establishing (if contested) the competency of the operator, the fidelity of the equipment, the absence of any meaningful alteration to the recording, and the identity of any speakers. Although acknowledging an additional element of audibility as a prerequisite to admissibility, the United States says (somewhat tautologically) that proffered transcripts of the recordings themselves demonstrate the necessary audibility of the recordings:

> The transcripts of the intercepted conversations referenced in the Indictment and the applications for extension of the oral interception order, which are filed *in camera* herewith, belie the defendants' contention. As evidenced by such transcripts, the government has prepared complete transcripts of the defendants' intercepted conversations. The transcripts clearly show that the tapes are "not inadmissible per se" because there are no "unintelligible portions [that] are so substantial as to render the recording[s] as a whole untrustworthy." [cites omitted]

However, this argument begs the issue of audibility by simply assuming the transcripts' accuracy, which obviously cannot be confirmed unless the recordings are audible. (One is left to wonder by what mechanism a transcript can validate its own contents without reference to the audibility of the recordings.)

■ The United States also suggests (1) that, if the United States' transcripts of these recordings are inaccurate, the Aisenbergs' "remedy" is to prepare a distinct set of transcripts for presentation to the jury and (2) that, thereafter, "it is the jury's responsibility to decide which version of the transcript, if any, is accurate." However, the jury's duty is never "to decide which version of the transcript ... is accurate." The jury's duty is to decide the content and evidentiary value of the recordings, if relevant, which may differ in whole or in part from any transcript. Transcripts, in a proper case, only *assist* the jury in understanding the evidence; the evidence is the recordings and *not* the transcripts.

■ The United States concludes the response by suggesting an audibility hear-

ing "shortly before trial." Failing that, the United States suggests that the Court play the tapes to the jury during the trial and rule on admissibility afterward (accompanied presumably by corrective instructions if the tape is excluded from evidence).

This latter suggestion is DENIED with finality. In support of the proposition that the Court should determine audibility in the presence of the jury, the United States cites *United States v. Carbone,* 798 F.2d 21 (1st Cir.1986), which discusses the audibility of recordings and the admissibility of both recordings and transcripts. The discussion in *Carbone* of the legal standard governing audibility is indistinguishable from the standard proposed by the Aisenbergs:

> This circuit has long followed the generally accepted rule that where a tape recording is challenged on the grounds of audibility the question is whether "the inaudible parts are so substantial as to make the rest more misleading than helpful" and that admissibility rests within the discretion of the trial judge.

798 F.2d at 24.

*Carbone* then discusses the admissibility of an expertly improved, enhanced, and consequently more audible version of an original recording. (Of course, in the Aisenbergs' instance, the United States has announced that attempts to enhance the quality of the pertinent recordings have failed.) *Carbone* notes that the defense never requested a pretrial audibility hearing and that the district judge "verbally chastised" the defense for that omission. The United States' response quotes *Carbone* as stating that there is "no reason why the district court must lengthen a trial by listening to the tapes outside the presence of the jury." In fact, the pertinent paragraph in *Carbone,* a case in which the opportunity for a pretrial audibility determination was forsaken by the defense, states that:

> The preferred way of handling challenges to the accuracy and audibility of

tape recordings is at a pretrial hearing. *If this is not possible,* we see no reason why the district court must lengthen a trial by listening to the tapes outside the presence of the jury.

(emphasis added) 798 F.2d at 25. Obviously, a pretrial determination of audibility in this case remains "possible." *Carbone* is easily distinguishable.

■ *Carbone* is, nonetheless, instructive. In discussing two contested exhibits, an original recording and an enhanced recording, Exhibits 15 and 19, respectively, *Carbone* states:

> We have played all of the tapes and find that none of them were so inaudible or unintelligible as to make them more misleading than helpful. It is true that exhibit 15, the tape of the visit of government informant Rivera (Manny on the tape) to defendant's office on September 19, 1984, had *large gaps due to inaudibility caused by the overlay of background noises.* This tape, however, was filtered and then enhanced into a new tape, exhibit 19, which was *clear and understandable.* The judge explained to the jury that exhibits 15 and 19 were recordings of the same conversations and had them both played.

(emphasis added) 798 F.2d at 25. *Carbone* teaches that an otherwise inaudible recording, featuring an "overlay of background noises," is admissible if and when "filtered and enhanced" with expert assistance and if a qualified witness establishes that the conversation emerging from the obscurity of noise and other interference becomes "clear and understandable" and is the same conversation that was originally recorded. *Carbone* both confirms the admissibility of audible, enhanced recordings and confirms the problem arising from "inaudibility caused by the overlay of background noises."

### The Definition of Audibility

■ The issues presented by the Aisenbergs' motion require some prefatory

comments concerning the meaning of "audibility" and the registration of some pertinent distinctions at the perimeter of audibility. Admissibility, of course, means that the finder of fact, in this instance a jury, may lawfully consider certain evidence, even if for only a limited purpose. Admissibility is the final threshold that proffered evidence must overcome before its consideration by the finder of fact. Generally, admissibility includes genuineness and authenticity; relevance as defined in Rule 402, Federal Rules of Evidence; probativeness, which must exceed any accompanying prejudice, as prescribed in Rule 403, Federal Rules of Evidence; and the absence of some substantive legal objection to its consideration, such as a pertinent testimonial privilege or a hearsay objection. This chain of evidentiary qualification, if satisfied, results in admissibility. (Of course, this is a summary and is not exhaustive.)

■ Before a determination of the admissibility of an audio recording, (1) the proponent of the proffered evidence must establish by other evidence that the matter offered is genuine and authentic and otherwise provide necessary foundational information and (2) the recording must be audible both (a) in the sense that the listener can hear satisfactorily the words spoken and reliably distinguish them from other words that sound similar (and other sounds, not words, that sound like words) and (b) in the sense that enough of the recording is distinguishable to permit the listener to reasonably determine the sense in which the words are used, i.e., the sense in which the speaker intended them.

■ In other words, the word "audibility" permits two somewhat different and confusing definitions. "Audible" can mean simply that some sound or any part of some sound actually can be heard. On the other hand, "audible" can mean that some sound or part of some sound can be heard sufficiently to permit the listener to ascertain with reasonable reliability the sense in which the speaker used any word or words that can be heard. The former is the ordinary meaning of "audible." The latter is the meaning of "audible" in the legal sense. Trustworthiness or reliability is an elemental component of the term "audible" within the contemplation of the law of evidence.

■ *United States v. Pope,* 132 F.3d 684 (11th Cir.1998), states that:

> The district court is required to exclude a recording only if the inaudible or unintelligible portions "are so substantial as to render the whole recording untrustworthy." [cites omitted] This determination of reliability is left to the sound discretion of the trial judge.

132 F.3d at 688. This statement confirms that, used essentially as synonyms, "trustworthiness" and "reliability" are elements of legal audibility in the law of evidence. Similarly, in *Sherman v. Burke Contracting, Inc.,* 891 F.2d 1527 (11th Cir.1990), a tape recording was offered as evidence in a claim of racial discrimination in employment. Although finding that "portions of the recording were inaudible," the district court admitted the recording into evidence because "the recording adequately revealed the relevant portion of the conversation between Sherman and Palmer ...." In other words, despite partial inaudibility, the recording was admitted because the audible portion was sufficiently reliable *when judged in light of the relevant purpose for which the proponent offered the recording.* In other words, a partially inaudible recording is legally audible if enough of the recording is actually audible to provide reliable and trustworthy evidence of a relevant point.

Consider a twenty minute recording of a conversation, of which only ten seconds is audible. For most purposes, this recording, 99.2% of which is inaudible, would seem legally inaudible and inadmissible. However, in the ten seconds of audible conversation the speaker can be heard to utter the name of a person. Assume the defendant, whose voice is captured in this

hypothetical recording, has denied under oath that, at the moment of the recorded conversation (almost all of which cannot be heard and which is palpably inaudible by any normal measure), the defendant was unaware of the existence of the person whose name he has spoken audibly in the ten seconds of "audible" recording. The listener cannot know from the largely inaudible recording why, in what sense, or for what reason the defendant has spoken the person's name, i.e., the listener cannot *understand* the speaker, although to an acutely limited degree the listener can *hear* the speaker. Nonetheless, in a case in which the defendant's knowledge of the mere existence of the person or his name is relevant (for example, perjury, if the defendant testified differently), the recording almost certainly is admissible (assuming the foundational matters are satisfied).

Similarly, a recording that contains thirty minutes of uninterrupted silence, i.e., a recording on which nothing can be heard at all, is "inaudible" in one sense yet audible in another sense. If the existence of silence at a particular place and time is pertinent to show a relevant fact (for example, to show that no shooting occurred), an entirely silent recording (again, assuming a proper foundation) might be admissible into evidence to establish that nothing occurred or no word was spoken. If proof of silence is the purpose for which the recording is offered, the silence is "audible," although no particular sound can be heard. The recording is legally audible in light of its purpose.

Extended consideration of the notion of audibility (or inaudibility) reveals some other useful insights. Obviously, the notion of audibility must be judged with reference to the purpose for which the recording is being offered. A recording may be offered to show some specific fact, for example, that someone was alive on a particular day, that someone was not deaf on that day, that someone was in a particular place or with a particular person, or a thousand other particularized purposes, as varied as the sum of the history of all cases suggests. Many permissible purposes for proof require little in the way of audibility to assure the reasonable reliability of evidence to establish some particular fact. On the other hand, a recording may be offered principally to prove the substance of its contents as a whole and to establish their truth. The meaning of the words may depend on context, diction, and other matters susceptible to nuance. For that purpose, much more audibility is reasonably required. Further, extrinsic evidence may suggest the meaning of audible words, even if only a few are audible, or provide context not otherwise present in the recording. Also, because the purpose for which the recording is offered is variable almost without limit, the law invests the trial judge with ample discretion to thoughtfully determine audibility in light of a highly case specific analysis, capable of responding to arcane and novel circumstances, including the extent to which the words in the recording can be reliably heard, the purpose for which the particular proof is offered, and the extent of any pertinent extrinsic evidence available to provide context or meaning not available in the literal contents of the audible sounds. Further, the range of results is broad. A recording, on which almost nothing (or, as suggested, absolutely nothing [if silence is nothing] ) can be heard, may be legally "audible" for the proof of one particular thing but perhaps not for the proof of another. On the other hand, a recording on which much can be heard may be legally inaudible if necessary context is absent from the recording itself and from extrinsic evidence.

To summarize, if a recording contains words or other relevant things that can be heard (and I include silence or any other particular sound, if relevant), a judge must insist that sufficient evidence is available, either from the contents of the recording itself or from extrinsic proof, to which the proponent directs the judge's attention, to permit a reasonable juror ra-

tionally and reliably (which is not to say with absolute certainty but, at least, with informed reason) to ascertain the meaning of the pertinent matter. In other words, the recording must offer a juror, who is considering only those things that a juror should lawfully consider (assisted by common sense and experience, including knowledge of language and habits of speech), a rational basis founded on the evidence by which to reasonably adopt a hypothesis concerning the meaning of the recordings and to reasonably exclude other hypotheses. This is to say that a juror should not arrive at an interpretation of a recording based on mere speculation and unleavened imagination, stimulated by an occasional verbal fragment, a suggestive word, a detached phrase, or an excited but incomplete exchange, plucked from its intended context and placed provocatively in the juror's way.

Concern for reliability pervades the pertinent decisions, among which little disagreement appears respecting the applicable standard. *United States v. Robinson*, 707 F.2d 872, 877 (6th Cir.1983), states that the proper exercise of the Court's discretion "presumes, as a prerequisite to admission, that the tapes be authentic, accurate, and trustworthy. Moreover, they must be audible and sufficiently comprehensible for the jury to consider the contents." *United States v. Scaife*, 749 F.2d 338, 345 (6th Cir.1984), states that, "abuse of discretion [in admitting tapes] is present only where the unintelligible portions of a tape recording are so substantial that the recording as a whole is rendered untrustworthy." *United States v. Disbrow*, 768 F.2d 976, 981 (8th Cir.1985), formulates the pertinent issue as whether the "taped conversations were audible enough to give the jury the 'gist' of what happened."

■■■■■ Regardless of the precise formulation employed by the Court, reliabili-

ty and trustworthiness recur as an element of audibility. If the purpose for which the recording is offered is relatively narrow and specific (such as mere presence at a place), less audibility is required to ensure reasonable reliability. If the purpose for which the recording is offered is the specific meaning and intent of an entire recorded exchange, greater audibility is required. The required audibility is determined in light of the object of the proof, i.e., the purpose for which the recording is proffered. This determination is sensitive to the particulars of each case, and the trial judge must exercise sound discretion in resolving this issue. As stated in *United States v. Greenfield*, 574 F.2d 305 (5th Cir.1978):

> This court has not adopted any formulistic standard to guide the admissibility of tapes and transcripts. Tapes are not per se inadmissible because they are partially inaudible; the issue is whether the unintelligible portions 'are so substantial as to render the recording as a whole untrustworthy. This determination is left to the sound discretion of the trial judge.' *United States v. Avila*, 443 F.2d 792, 795 (5th Cir.1971).... The trial judge followed the course we have recommended in holding a prior hearing concerning the intelligibility of the tapes and the accuracy of the proposed transcripts, and in permitting defense counsel to contest the transcript as proposed by the government, *United States v. Onori*, 535 F.2d 938, 947–49 (5th Cir. 1976).

As stated earlier, a recording must combine actual, but not necessarily complete, audibility with reasonable reliability, measured in light of the purpose for which the recording is offered in evidence, in order to achieve "legal audibility" and consequent admissibility (assuming satisfaction of the additional evidentiary elements).[1]

---

1. Rule 106, Federal Rules of Evidence, applies to recordings. Accordingly, if another part of a recording is necessary to ascertain the meaning of the part of the recording that

is proffered as evidence, the adverse party can require that the proponent play the other part contemporaneously for the jury as required by fairness. However, if the other part of the

■ Experience confirms that public curiosity is excited by recordings of the conversations of individuals in an episode that energetically engages the public's interest—conversations that, for example, admit the public into the home, into the bedroom and kitchen, and into private conversations of a family. If the contents of these conversations are lawfully obtained and relevant, audible, and admissible, the fact of their former privacy will not preclude their admissibility. However, public interest in a matter is irrelevant to admissibility. In a sense, the public is entitled to speculation, to rumor, to tendentious belief, and to stubborn conviction. On the contrary, a juror is bound by the duty to adhere to evidence and reason. To base a verdict, in whole or in part, on raw speculation and baseless conjecture arising from fragmented and incomprehensible evidence is irrational and impermissible, notwithstanding the extent to which an isolated or fragmented utterance may tantalize observers and fire their imaginations. A trial judge must serve as a temperate guardian against the intrusion of unreliable evidence and speculation into the calculus of a jury's verdict. Relevant evidence, including recordings, is admissible as a general rule, but unreliable and deceptive evidence is not. The well known principles of the law of evidence sharply distinguish one from the other.

### The Aisenberg Recordings

■ The United States submitted thirty-two recordings for a determination of audibility. These recordings were transferred by the United States from an audio tape format to a compact disk format. The United States and the Aisenbergs have stipulated that the audio tapes and the compact disks produce sounds that are not audibly distinguishable in this instance. The Court has listened only to the compact disks, which are the means by which the United States will offer the evidence at trial. The defense offers no objection to use of the compact disks as the means of offering the testimony (although the defense objects to the contents).

The Court listened to these recordings by several methods. I listened at least twice without the aid of any extrinsic matter. I subsequently reviewed certain transcripts offered by both the United States and the Aisenbergs. I listened repeatedly and to some extent compared the sounds on the recordings to the competing transcripts. Accordingly, I made a gradual assessment of the quality of the recordings and the quality of the transcripts and remained acutely conscious of any influence from the transcripts. (Although I have reviewed the Aisenbergs' experts' affidavits, they will play no part in my determination.) I have reviewed these recordings thoroughly and attentively.

The quality of these recordings generally is poor. The recordings contain background and foreground interference, other random noise, and prominent distortions, which together materially obscure large portions of most or all of these recordings. Considered in gross, these recordings are largely inaudible. At least some of the matters appearing in quotation marks in the indictment are inaudible. However, these recordings contain intermittent words, phrases, and utterances, some of which adjoin one another or are near one another. Therefore, in addition to any of the tapes that are undisputed (five are undisputed), some or all the other recordings may be legally audible, dependent upon the evidentiary purpose for which they are offered.

recording is inaudible and the meaning of the proffered part is dependent upon the obscure and inaudible part, the purpose of Rule 106 is frustrated impermissibly. The selective and deceptive (or at least, unreliable and untrustworthy) use of the contents of a recording is as improper as the receipt of only a fraction of a deposition or other writing, if meaning is dependent on completeness. *See generally* 1 JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S FEDERAL EVIDENCE § 106.07 (Joseph M. McLaughlin ed., 2d ed.2000). *See also* Rule 15(e), *Federal Rules of Criminal Procedure.*

Accordingly, the United States is directed to submit in writing by November 22, 2000, a statement of the evidentiary purpose for which each of the thirty-two tapes is offered. Similar in nature to the typical response by a party during trial when asked, for example, pursuant to Rule 401, Federal Rules of Evidence, the purpose for which some matter is offered, this statement should sufficiently state the point for which the recording is offered to permit the Court to make an informed ruling concerning the legal audibility of each recording.[2] The statement should include reference to any extrinsic evidentiary matter necessary to understand the purpose for which the recordings are offered.

The hearing scheduled for November 16, 2000, is continued pending further order. The hearing before Magistrate Judge Pizzo set for December 11, 2000, is unaffected by this Order.

---

2. The Advisory Committee Notes to Rule 401, Federal Rules of Evidence, are particularly helpful in explaining the Rule 401 standard of relevance.